UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                      Case No. 15-cr-20316

v                                           Honorable Thomas L. Ludington

ROBERT DARNELL JAMERSON,

        Defendant.
_____/

**ORDER GRANTING IN PART MOTION FOR DISCLOSURE OF NOTES, DENYING FIRST MOTION TO SUPPRESS EVIDENCE, GRANTING SECOND MOTION TO SUPPRESS EVIDENCE, AND SUPPRESSING EVIDENCE DISCOVERED DURING THE EXECUTION OF THE MAY 27, 2015 SEARCH WARRANT**

Following a search of his residence on August 20, 2014, Defendant Robert Darnell Jamerson was indicted on one count of being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). ECF No. 3. That indictment resulted in the issuance of an arrest warrant for Jamerson, which led to a second search of his residence on May 28, 2015. That second search in turn led to a superseding indictment on August 26, 2015, containing an additional count of being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). ECF No. 22.

Jamerson moves to suppress the evidence discovered in both searches. ECF Nos. 18, 25. He also moves for disclosure of any notes that agents took during the first search on August 20, 2014. The government does not oppose this motion, but claims that no such notes exist at this time. Accordingly, Jamerson's motion for disclosure of the agents' rough notes will be granted in part. Jamerson's first motion to suppress will be denied. With regard to his second motion to suppress, the Court held a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) on

October 29, 2015 and November 23, 2015. Because Jamerson has met his burden under *Franks*, his motion to suppress will be granted and the evidence will be suppressed.

**I.**

**A.**

On August 20, 2014 at around 3:00 PM, officers with the Michigan State Police Fugitive Team went to Defendant Jamerson's residence at 1021 Cathay Street, Saginaw, Michigan in attempt to locate a fugitive named Tracey Rutherford, for whom they had an outstanding felony arrest warrant. Def.'s Mot. to Suppress I Exhibit G. Jamerson answered the door and told them that, although the fugitive received mail at the house occasionally, she did not live there. Jamerson then gave the officers consent to search the house for the fugitive.

Detective Hunger testified that, upon entering the house, he saw prescription pill bottles and a codeine bottle with the label torn off in plain view in an open bag in plain view. Detective Hunger also testified that Officer Chad Bellinger recognized Jamerson as a convicted felon from a previous encounter, and immediately informed the rest of the officers of Jamerson's status as a convicted felon. Officer Bellinger then remained with Jamerson in the kitchen while the other officers searched for the fugitive.

While searching for the fugitive, Detective Hunger testified that he noticed ammunition in plain view throughout the house, including on a vanity shelf in the bedroom and in a hallway closet. While searching a bedroom for the fugitive, Detective Hunger searched under the bed and saw a handgun among several other items stored under the bed.

Detective Hunger also testified that he was informed by another officer that a partially exposed rifle had been discovered in the basement after police moved a couch a few feet away from the wall to look for Rutherford. Officer Joseph Labelle testified that he was the officer who

discovered the rifle behind the couch. He testified that he searched behind the couch because it was common for people to hide behind couches and that he had found several people hiding behind couches in the past. He further testified that he did not move or manipulate the rifle or its coverings in any way, but recognized it as a rifle because the barrel and part of the receiver were exposed.

Plaintiff United States alleges that only those two weapons were discovered during the initial fugitive search. Defendant Jamerson alleges that law enforcement discovered all four weapons at this time, including one discovered in closed backpack. He claims that law enforcement impermissibly exceeded the limited scope of the fugitive search by searching places that a fugitive could not physically be present.

After unsuccessfully completing their search for the fugitive, Dective Hunger testified that the officers began to question Jamerson about the items they had discovered during the search. Jamerson informed Detective Hunger that he did not have a medical marijuana card and that he was a convicted felon. Pl. Resp. to Def.'s Mot. to Suppress I, Exhibit 11. A criminal history search for Jamerson affirmed his status as a convicted felon. *Id*.

At 3:40 PM, Detective Greg Remer advised Jamerson of his Miranda rights. *Id*. at Exhibit 12. Defendant then signed a Miranda waiver. *Id* at Exhibit 10. Detective Williams also submitted an affidavit under oath seeking a search warrant for Jamerson's house. Def.'s Mot. to Suppress I Exhibit G. Judge Terry L. Clark then issued a search warrant. Pl. Resp. to Def.'s Mot. to Suppress I, Exhibit 11.

The officers executed the search warrant and the full consent search of Jamerson's residence at 4:45 PM on August 20, 2014. The officers seized:

1. One loaded Taurus, .357 caliber revolver, model Tracker, SN# FX689833, which was registered to defendant's girlfriend, from under the bed in the bedroom;

2. One loaded, with an extended 30-round magazine, Glock, 9 mm caliber, semi-automatic pistol, Model 17, Serial Number ERR112US, which had been reported stolen, from under the bed in the bedroom;

3. One Izhmash, 76.2 caliber, semiautomatic rifle, Model Saiga, Serial Number H03600985, which had been reported stolen, from the 1:15-cr-20316-TLL-PTM Doc # 20 Filed 08/25/15 Pg 6 of 16 Pg ID 103 7 basement;

4. One loaded Bersa, 9 caliber, semi-automatic pistol, Model Mini 9 Fire Storm, with obliterated serial number, from a backpack in the bedroom;

5. Assorted ammunition from a vanity shelf in the bedroom, the top dresser drawer in the bedroom, the backpack in the bedroom, the living room, and the hallway closet;

6. Assorted firearms magazines from the top dresser drawer in the bedroom and the backpack in the bedroom;

7. Approximately 31.5 grams of marijuana from the top of the cabinet in the living room and from the backpack in the living room; and

8. One bottle of Prometh-codeine from the living room backpack.

*Id.* Defendant was not placed in custody or seized on August 20, 2014.

**B.**

On May 27, 2015, Defendant Jamerson was indicted on one count of being a felon in possession of firearms, and an arrest warrant was issued for Jamerson on that date. ECF Nos. 3, 4. The following day, May 28, 2015, the Fugitive Team established surveillance at Jamerson's residence. After Jamerson arrived home, a white female driving a Dodge Durango stopped by his house and then left after approximately three minutes. Defendant Jamerson was then arrested. At the time of his arrest, he had around $576 on his person.

During the course of the arrest, the officers smelled a strong odor of marijuana. Jamerson informed the officers that he had a Medical Marijuana Card, making it legal for him to possess

up to 2.5 grams of marijuana under Michigan law. The officers then discovered two grams of marijuana in a kitchen drawer together with a digital scale and an empty Vicodin pill bottle with someone else's name on it. Jamerson told the officers that he did not have any other drugs or guns in the house and did not give the officers further consent to search the residence.

The officers then telephoned Seargent Eric Wilber, with the Bay Area Narcotics Enforcement Team ("BAYANET"), and described to him the information they had learned. Seargent Wilber, in turn, prepared an affidavit under oath in support of a search warrant for evidence related to "narcotic sales" at Jamerson's residence to State District Court Judge A. T. Frank. In its relevant part, the affidavit stated:

> A) D/Sgt. Wilber is a certified and sworn law enforcement officer with over twenty years of experience working for the Michigan State Police. D/Sgt. Wilber is currently assigned to the Bay Area Narcotics Enforcement Team. D/Sgt. Wilber's current duties include investigating crimes that involve violent offenses, narcotics and weapons. D/Sgt. Wilber will be referred to as the affiant from this point forward.
>
> B) On May 28, 2014 the affiant was advised that one Robert Jamerson was arrested on an outstanding felon in possession of firearms warrant at his known residence. The fugitive identified as Robert Jamerson was in his home at the time of his arrest located at 1021 Cathay St. This address is located within the city of Saginaw.
>
> C) At the scene of the arrest, D/Tpr. Stoppa observed a clear baggie with suspected marijuana residue and could smell fresh marijuana in the residence. Robert Jamerson stated he had marijuana in his kitchen drawer, pointing at the same. Robert Jamerson indicated he had approximately two grams of marijuana.
>
> D) D/Tpr. Stoppa observed one clear bag containing approximately two grams of marijuana in the drawer identified by Robert Jamerson to include a black digital scale and an empty pill bottle in the name of a female (SXXXX C. GXXXX) that once contained Vicodin.
>
> E) D/Tpr. Stoppa asked Jamerson if he had anything else in the home such as firearms or additional narcotics, and Jamerson indicated he did not.
>
> F) D/Tpr. Stoppa asked Jamerson for consent to search the residence of 1021 Cathay, and Jamerson stated that if he did not have a search warrant he could not search his home any further.

> G) D/Tpr. Stoppa further advised that during surveillance of 1021 Cathay he observed a red Dodge Durango arrive at the residence an unknown white female driving. The female entered the residence and left three minutes later. The female was driving a '05 Dodge Durango bearing Michigan registration . . . . This vehicle is registered to an EXXXX TXXXX. . . . This surveillance observation is indicative of narcotics sales.
>
> H) During the arrest of Robert Jamerson, D/Tpr. Stoppa located five hundred and seventy six dollars in the right front pocket of Jamerson. The dollar amount and denominations were mostly in smaller bills, consistent with narcotics sales.

Def.'s Mot. to Suppress II, Exhibit A. Notably, the affidavit made no mention of Defendant's Michigan Medical Marijuana Card. Seargent Wilber testified that, although the officers on location had informed him that Jamerson claimed to have a valid medical marijuana card, he had not been provided with the specific numbers corresponding to Jamerson's alleged card to verify it, and he did not think it was relevant for purposes of the search warrant. Specifically, he testified that a card giving Jamerson the right to possess marijuana under Michigan law was irrelevant because "we're looking at delivery, indicators of delivery, not indicators of a possession."

Based on Seargent Wilber's affidavit, Judge Frank issued a search warrant for Jamerson's residence. In executing the search warrant that same day, the officers found a loaded handgun, assorted ammunition, marijuana, a digital scale, empty prescription bottles bearing other people's names, a DVD burner, and approximately 700 counterfeit movie CDs. The officers also swabbed the buttons on Jamerson's microwave, which field-tested positive for cocaine. Seargent Wilber testified that he also discovered Jamerson's medical marijuana card during the course of the search, in Jamerson's wallet with his license. As a result of this search, Defendant Jamerson was charged with an additional count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). ECF No. 22

### C.

On August 17, 2015, Defendant Jamerson filed a motion to suppress evidence discovered and seized in the initial August 20, 2014. ECF No. 17. Jamerson also filed a motion for the disclosure of any notes taken by the agents on that day. ECF No. 18.

On August 26, 2015, a Grand Jury charged Jamerson in a First Superseding Indictment with an additional count of being a felon in possession of a firearm based on the evidence discovered during the May 27, 2015 search. ECF No. 22. Jamerson filed an acknowledgment of the superseding indictment on August 31, 2015, and filed his second motion to suppress on September 14, 2015. ECF Nos. 23, 25. With regard to the second motion to suppress, the Government did not object to a hearing pursuant to *Franks*. Accordingly a *Franks* hearing was held on October 29, 2015, and continued on November 23, 2015.

**II**.

The Government concurs in Jamerson's motion for disclosure of the agents' notes. ECF No. 21. However, the Government claims that no local law enforcement officers or FBI agents involved in this case have any such notes at this time. The Government states that if any such notes are discovered, they will be retained. If and when any such notes are retained, the Government reserves the right to challenge whether those notes are or will be discoverable. Accordingly, Jamerson's motion for disclosure of the agents' notes will be granted in part.

**III**.

In his first motion, Jamerson argues that the evidence obtained from his home on August 20, 2014 should be suppressed because it is the product of a warrantless search and does not fall under an exception to the warrant requirement. ECF No. 17. The search of Jamerson's home on August 20, 2014 occurred in two separate stages. The first stage was the limited consent search for Fugitive Tracey Rutherford. During the course of that search, the officers discovered

incriminating evidence in plain view. This led to the second stage, in which the officers obtained further consent from Jamerson to search the premise and obtained a search warrant from a Judge Terry L. Clark to search the premise and seize evidence. Because the lawfulness of the second stage depends on the lawfulness of the initial stage, the limited consent search for Fugitive Tracey Rutherford will be addressed first.

**A.**

In general, warrantless searches and seizures presumptively violate the Fourth Amendment. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. const. amend IV. The Government contends that, after obtaining consent to search Defendant's residence for a fugitive it discovered incriminating evidence in plain view.

The "Plain View" doctrine is an exception to the warrant requirement. In *Harris v. United States*, 331 U.S. 145, 155 (1947), the Supreme Court held, "If entry upon the premises be authorized and the search which follows be valid, there is nothing in the Fourth Amendment which inhibits the seizure by law-enforcement agents of government property the possession of which is a crime, even though the officers are not aware that such property is on the premises when the search is initiated." The Supreme Court reaffirmed that holding in *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971), stating "under certain circumstances the police may seize evidence in plain view without a warrant." The Court further explained, "[w]hat the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an

intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." *Id*. at 466.

Over time, courts have developed a four factor test for determining whether the Plain View exception is applicable: (1) the officer is lawfully in the place where the evidence can be seen (2) the officer has lawful access to the evidence; (3) the evidence is in plain view; and (4) its incriminating character is "immediately apparent." *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir.2013); see also *Horton v. California*, 496 U.S. 128, 136–37 (1990).

### i.

The parties do not dispute that the officers were lawfully in the residence. Except in situations where consent has been given or exigent circumstances exist, "entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Steagald v. U.S.*, 451 U.S. 204, 210 (1981). The Government argues that the consent exception applies in this case because Jamerson consented to a search of his home for the fugitive. The Government contends it was during the course of this lawful search that the officers discovered incriminating evidence. Jamerson does not dispute that he gave the officers "limited consent to prove that he was not harboring a fugitive." Def.'s Mot. to Suppress I ¶ 8. Because the parties do not dispute that the officers were lawfully present in Jamerson's residence, the first element is satisfied.

### ii.

With regard to the second Plain View requirement, Jamerson argues that the officers did not have lawful access to the evidence because they went beyond the scope of his consent in discovering the evidence. Specifically, Jamerson alleges that the officers did not have consent to search under the bed or behind the couch because those were places physically impossible for a

person to hide. *Id*. at ¶ 9. Jamerson also alleges that the officers improperly located a 9mm pistol in a backpack at this stage of the search, which they did not have lawful access to.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect[.]" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). A search does not violate the Fourth Amendment when, after a defendant gives officers permission to search for a specific item, the officers search in areas that the item could reasonably be found. *Id*. In the context of fugitive sweeps, the search may only extend to "a cursory inspection of those spaces where a person may be found." *Maryland v. Buie*, 494 U.S. 325, 335, (1990).

**a.**

Numerous courts including the Sixth Circuit have held that officers may search under a bed during the course of lawfully searching for a fugitive. *See U.S. v. Lanier,* Fed.Appx. 239 (6th Cir. 2008) (Holding that it is reasonable to search for a persons under beds, regardless of whether the bed has a frame); *U.S. v. Flores*, 193 Fed.Appx. 597 (6th Cir. 2006) (concluding that "a reasonable person would understand that permitting police offers to search his or her home for a fugitive would mean permitting the officers to look under beds, because these are places a person could hide."); *U.S. v. Bass*, 315 F.3d 561 (6th Cir. 2002) (discovery of a shotgun found when an officer lifted the box springs of a bed while searching for a fugitive was proper); *United States v. Chambers*, 228 F.Supp.2d 474, 479 (D.Del. 2002) (allowing a search under a mattress and box springs that were lying directly on the floor).

In the present case, Officer Hunger's search under the bed was proper. The bed in question had a frame and was elevated off of the floor. *See* ECF No. 20 Exhibits 6-7. There was

space between the bed and floor sufficient for Jamerson to store additional items. Accordingly, a typical reasonable person would have understood that by giving officers consent to search for a fugitive he was consenting to a search under the bed. The discovery of the gun and prescription bottles under the bed was thus the product of a legal search.

**b.**

Jamerson also argues that the search behind the basement couch was unreasonable, and that the officers did not have lawful access to a bersa 9mm pistol found in a backpack. With regard to the rifle, at least one Circuit Court has held that searching for a person behind couches and other bulky furniture is proper. *See U.S. v. Tucker*, WL 44703 (10th Cir. 1999). Additionally Detective Hunger testified that he had found fugitives hiding behind couches in the past. Therefore, moving the basement couch away from the wall to search for the fugitive was proper. With regard to the pistol, that gun was not discovered during the first stage of the search, and did not form a basis for establishing probable cause for the later search warrant. Def.'s Mot. to Suppress I Exhibit G.

Even if the rifle discovered behind the couch and the 9mm pistol discovered in a backpack were improperly discovered at the fugitive stage of the search, their submission into evidence would still be proper under the inevitable discovery doctrine. Under this doctrine, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... [,] then the deterrence rationale has so little basis that the evidence should be received." *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir.2008) (*quoting Nix v. Williams*, 467 U.S. 431, 444 (1984)).

The Government has carried its burden in the present case. As explained above, the discovery of the handgun under the bed was proper. The discovery of that gun alone is sufficient

- 11 -

to establish probable cause to support a valid search warrant. Because the authorities could have obtained a valid search warrant based on that single weapon, any additional weapons discovered during the first stage of the search would have been discovered anyway while searching the residence pursuant to the search warrant.

### iii.

As to the third Plain View requirement, the parties' dispute whether the rifle discovered behind the couch was actually in plain view. Jamerson argues that the gun was concealed in a trash bag and in cardboard, and that law enforcement unlawfully manipulated the rifle coverings, thus exceeding the scope of the limited fugitive search. The government contends that the barrel of the rifle was exposed to the naked eye, and that a trained law enforcement officer such as Officer Joseph Labelle could recognize the item as a firearm without manipulating the firearm or its coverings based on the barrel alone. *See* ECF No. 20 Exhibit 9.

First, Officer Labelle testified under oath that he did not move or manipulate the rifle or its coverings in any way, but recognized it as a rifle because the barrel and part of the receiver were exposed. Second, even ignoring the testimony of Officer Labelle, this dispute is immaterial. Even if the rifle was not in plain view and law enforcement manipulated the coverings, the inevitable discovery doctrine still applies, as discussed above, and allows the rifle's admittance into evidence. Because the authorities could have obtained a valid search warrant based on the single weapon discovered under the bed, the rifle would have inevitably been discovered during the second stage of the search pursuant to the warrant. Thus even if the rifle was wrongfully discovered, exclusion of the evidence is not warranted. *Alexander*, 540 F.3d at 502.

### iv.

Jamerson finally argues that the incriminating character of the firearms was not immediately apparent. However, because the officers were aware of Jamerson's status as a felon, the incriminating nature of the guns was readily apparent. Thus all four elements of the Plain View test are satisfied, and the discovery of incriminating evidence in plain view during the course of searching for Fugitive Tracey Rutherford was lawful.

**B.**

Defendant Jamerson also argues that the evidence seized during the second phase of the search on August 20, 2014 should be suppressed. Jamerson does not dispute that he signed a Miranda waiver form at 3:40 PM on that date. Def.'s Mot. to Suppress I, Exhibit I. Nor does he dispute that he gave the officers consent to conduct a complete search of his residence at 4:00 PM. *Id*. at Exhibit F. Jamerson also does not dispute that the officers obtained a valid search warrant on that date. Pl. Resp. to Def.'s Mot. to Suppress I, Exhibit I.

The Fourth Amendment requires that probable cause be determined by a "neutral and detached magistrate." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The affidavit that the magistrate reviews "must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for the issuance of the warrant." *United States v. Smith*, 182, F.3d 473, 477 (6th Cir. 1999). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In determining whether probable cause exists, a magistrate must look at the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). The Sixth Circuit instructs the reviewing court to "accord the magistrate's determination great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (internal citations omitted). A "magistrate's discretion should only be reversed if it was arbitrarily exercised." *Id.*

Here, there are no grounds for overturning the decision of the neutral and detached magistrate to issue the search warrant. There is no allegation that the magistrate judge was not neutral or detached, and the information provided in the affidavit supporting the warrant establishes probable cause for the second search. Furthermore, the four weapons, marijuana, ammunition, magazines, and buccal swab were not seized until 4:45 PM, over an hour after Jamerson gave the officers written consent to conduct a complete search of his residence. *Id*. For these reasons, Jamerson's first motion to suppress will be denied.

## IV.

Defendant Jamerson's second motion to suppress seeks to suppress evidence discovered during the search of his residence on May 28, 2015. Jamerson argues that the search warrant issued on May 28, 2015 lacked probable cause and that he is entitled to suppression of the evidence pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). This motion will be granted, and the evidence will be suppressed.

Under *Franks v. Delaware,* a defendant has the right to "challenge the sufficiency of an executed search warrant by attacking the veracity of the affidavit supporting the warrant." *U.S. v. Fowler*, 535 F.3d 408 (6th Cir. 2008). A defendant alleging that an officer made material omissions in his affidavit carries a higher burden than a defendant alleging that an officer made false affirmative statements because of the "potential for endless rounds of Franks hearings due to potentially endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id*. at 415-16 (internal quotations and citations omitted). A defendant is entitled to a *Franks* hearing on the basis of alleged material omissions only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting

information from the affidavit; and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it. *Id.* at 415.

Here, Defendant Jamerson has satisfied both elements. First, omitting from the affidavit the fact that Jamerson had a Michigan Medical marijuana card misrepresented "the totality of circumstnaces." With his Medical Marijuana card, Jamerson could legally possess up to 2.5 ounces of marijuana under Michigan law. At the time of his arrest, Jamerson possessed only 2 grams. The government does not dispute that Jamerson informed them that he had a medical marijuana card when they initially entered his residence. Despite this knowledge, Sgt. Wilber omitted this fact because it did not support BAYANET's case for probable cause, explaining during the hearing as follows:

> Q: By not telling the District Court judge about the medical marijuana card, you presented information to that judge as if it was illegal, correct?
>
> A: No, we're looking at a delivery, indicators of delivery, not indicators of a possession. It wasn't relevant, and that was discussed with the prosecutor.
>
> Q: Okay, but you made a conscious decision not to disclose the possibility of a medical marijuana card to a District Court judge, correct?
>
> A: That — yes, that's true

Wilber Dep. at 10:17-11:1. In focusing only on the evidence that supported a theory of distribution rather than explaining the totality of known evidence, Sgt. Wilber omitted material information that the magistrate judge needed to make a determination of whether there was probable cause to believe that Defendant Jamerson was conducting narcotic sales at 1021 Cathay Street.

Second, if the fact that Jamerson had a Medical Marijuana card was included in the affidavit, the affidavit would not support a finding of probable cause. The inclusion of Jamerson's Medical Marijuana card undercuts the incriminating character of the marijuana and

the scale. Including that fact results in the following evidence: (1) Jamerson possessed two grams of Marijuana and a scale, which he could legally possess under Michigan law;[1] (2) Jamerson possessed an empty Vicodin bottle with someone else's name on it; (3) Jamerson was carrying around $576 in cash; and (4) a woman paid a short visit to Jamerson's residence.

The government argues that just because Jamerson had the right to possess the marijuana under state law does not mean that he had the right to distribute it. Seargent Wilber specifically testified that he did not think the medical marijuana card needed to be included in the affidavit because they were only looking for evidence of delivery, not possession. However, under Michigan law, an intent to deliver "may be proven by circumstantial evidence and also may be inferred from the amount of controlled substance possessed." *People v. Williams*, 707 N.W.2d 624 (Mich. Ct. App. 628). Under Michigan state law, Jamerson could legally possess up to 2.5 ounces of marijuana. Jamerson was found with around 2 grams of marijuana, or .0705 of an ounce. Jamerson therefore possessed less than three percent (3%) of the legal limit. The marijuana was discovered in a single location in a single bag, not packaged separately for distribution. These facts do not give rise to an inference that Jamerson intended to distribute his prescription.

The inclusion of Jamerson's Medical Marijuana card in the affidavit may still result in facts that together create a reasonable suspicion that Jamerson was distributing controlled substances. However, reasonable suspicion is not enough to support the issuance of a search warrant. Because the facts do not give rise to probable cause that Jamerson was distributing controlled substances, Jamerson's second motion to suppress will be granted.

**V.**

---

[1] The effect of the Medical Marijuana card under federal law is not at issue in this case. The officers obtained the search warrant from a Michigan state judge, and therefore the effect of the Medical Marijuana card under Michigan law is the appropriate inquiry.

Accordingly, it is **ORDERED** that Defendant Jamerson's motion for disclosure of agents' rough notes, ECF No. 18, is **GRANTED IN PART**.

It is further **ORDERED** that Defendant Jamerson's first motion to suppress evidence, ECF No. 17, is **DENIED**.

It is further **ORDERED** that Defendant Jamerson's second motion to suppress evidence, ECF No. 25, is **GRANTED**.

It is further **ORDERED** that any evidence discovered during the execution of the May 27, 2015 search warrant is **SUPPRESSED**.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: December 10, 2015

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 10, 2015.

s/Michael A. Sian  
MICHAEL A. SIAN, Case Manager